IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IDA CASON CALLAWAY )
FOUNDATION, INC., )
　　　　　　　　　　　　　　　　 )
　　　　　　Plaintiff, )
v. ) Civil Action No. 3:22-cv-406–HEH
　　　　　　　　　　　　　　　　 )
ACE AMERICAN INSURANCE )
COMPANY, )
　　　　　　　　　　　　　　　　 )
　　　　　　Defendant. )

## MEMORANDUM OPINION
### (Granting Defendant's Motion to Dismiss)

This matter is before the Court on Defendant ACE American Insurance Company's ("Defendant") Motion to Dismiss (the "Motion," ECF No. 26), filed on November 18, 2022. Defendant moves the Court to dismiss Plaintiff Ida Cason Callaway Foundation, Inc.'s ("Plaintiff") Amended Complaint (ECF No. 23), filed on October 21, 2022. Defendant's Motion raises for the first time before this Court an issue relating to the ongoing COVID-19 pandemic. Plaintiff has owned and operated a resort located in Georgia, known as Callaway Gardens Resort ("Callaway Gardens" or the "Resort"). Like many resorts, COVID-19-related mandates forced Callaway Gardens to reduce in-person services. Plaintiff originally filed its Complaint in the Circuit Court of Richmond (ECF No. 1-1) after its insurer, Defendant, denied its reimbursement request for $1 million of pandemic-related losses. Defendant timely removed the Complaint to this

Court on May 31, 2022.[1] (Notice of Removal, ECF No. 1.) Defendant then filed a Motion to Dismiss the original Complaint on July 18, 2022. (ECF No. 11.) The Court heard oral argument on that motion on October 7, 2022. (ECF No. 22.)

At the October 7 hearing, the Court, by oral order, granted Defendant's Motion to Dismiss pursuant to Federal Rule of Civil Procedural 12(b)(6) and allowed Plaintiff to file an Amended Complaint within 14 days following the hearing. (ECF No. 22.) Plaintiff then amended its Complaint, seeking a declaratory judgment that Defendant's insurance policy covers its losses, and that Defendant must reimburse said losses (Count I), and alleging a breach of contract claim (Count II). (*Id.* ¶¶ 30–38.) Defendant filed the instant Motion to Dismiss, and the parties submitted memoranda supporting their respective positions. The Court heard oral argument on January 10, 2023. At the close of the January 10 hearing, the Court indicated that it was inclined to deny Defendant's Motion. However, upon further review, the Court will, for the reasons stated herein, grant Defendant's Motion to Dismiss.

## I. BACKGROUND

Viewed through the lens of Rule 12(b)(6) review, the relevant facts are as follows. Defendant issued policy number GPA-D42219174-003 to Plaintiff for coverage of its property, Callaway Gardens, for a policy period of March 8, 2020 to March 8, 2021. (Ex.

---

[1] The Court has diversity jurisdiction under 28 U.S.C. § 1332. Plaintiff is a non-profit corporation with its principal place of business in Pine Mountain, Georgia, and Defendant is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. The amount in controversy is $1 million, which is well above the $75,000 threshold. Furthermore, the Policy provides that disputes shall be adjudicated in a court of law whose jurisdiction includes Richmond, Virginia. (Am. Compl. ¶ 11.)

2

A to Am. Compl. at 10, ECF No. 23-1 (hereinafter the "Policy").) Like many other property insurance policies addressed by courts in the United States facing this issue, the Policy is an "all-risk" policy. (*Id.*) All-risk policies provide blanket coverage terms and may include specific exclusions. (*Id.*) The Policy in this case:

> covers the interest of the insured in all real and personal property earned, used, leased or intended for use by the insured or in which the insured may have an insurable interest, or for which the insured may be responsible for the insurance, or real or personal property hereinafter constructed, erected, installed, or acquired including while in course of construction, erection, installation, and assembly, and also including Improvements and Betterments (collectively "Covered Property").

(*Id.* at 12.) The Policy also provides business interruption coverage, which encompasses coverage for "Loss of Attraction." (*Id.* at 22.) The "Loss of Attraction" provision states:

> h) Loss of attraction – This Policy is extended to insure loss as insured hereunder, including Clean Up and Remediation, when there is an interruption or interference with the business of the Insured as a consequence of:
>
> > 1. Infectious or contagious disease (excluding Coronavirus 2019 COVID-19) manifested by any person while on the Covered Property of the Insured which results in the total or partial closure of the Covered Property at the direction of The National Center for Disease Control and/or the applicable state, city or municipal department of public health;
> >
> > 2. Murder or suicide occurring at the Covered Property of the Insured;
> >
> > 3. Injury or illness sustained by any person arising from or traceable to foreign or injurious matter in food and drink provided on the Covered Property of the Insured or the threat thereof;
> >
> > 4. Closing of the whole or part of the Covered Property of the Insured by order of a public authority consequent upon the existence or threat of hazardous conditions either actual or suspected at the Covered Property of the Insured.

3

(*Id.*) Two sub-parts from the aforementioned Loss of Attraction provision are especially relevant. The first, Section 20(h)(1), is a limited grant of coverage for losses resulting from "an interruption or interference with the business" caused by "[i]nfectious disease or contagious disease," *excluding* losses arising from COVID-19." (*Id.*) The second, Section 20(h)(4), is a limited grant of coverage for losses due to "an interruption or interference with the business" as a result of the full or partial closure of the "Covered Property" by public authority "consequent upon" the actual or suspected presence of "hazardous conditions" at the "Covered Property." (*Id.*)

On March 14, 2020, due to the impact of the COVID-19 pandemic, the Governor of Georgia, Brian Kemp ("Governor Kemp") declared a state of emergency for the State of Georgia. (Ex. B to Am. Compl. at 1, ECF No. 23-2.) On March 23, 2020, Governor Kemp exercised his emergency powers under Georgia Code § 38-3-51 to restrict the number of persons that could gather in a single location due to concerns related to the spread of COVID-19. (*Id.* at 2–4.) The Order restricted the number of persons that could gather at a single location, and also stated that "no business, establishment, non-profit corporation, or organization shall allow more than ten (10) persons to be gathered at a single location if such gathering require persons to stand or be seated within six (6) feet of any other person." (*Id.*) The Order also mandated that "all businesses which possess a license to operate as or otherwise meet the definition of '[b]ar'" under Georgia law "shall cease operation while this Order is in effect." (*Id.*)

On April 2, 2020, Governor Kemp reiterated the distancing requirements and

4

further ordered residents and visitors to shelter in place unless they were conducting or participating in "Essential Services," performing "Necessary Travel," engaging in "the performance of Minimum Basic Operations for a business," or part of the "workforce for Critical Infrastructure." (Ex. C. to Am. Compl. at 2–3, ECF No. 23-3.) The April 2 Order also required "all restaurants and private social clubs [to] cease providing dine-in services" with limited exceptions not applicable to the Resort. It also dictated:

> That all gyms, fitness centers, bowling alleys, theaters, live performance venues, operators of amusement rides . . . body art studios . . . estheticians . . . hair designers . . . and businesses which possess a license to operate as or otherwise meet the definition of "bar" as defined by Code Section 3-1-2(2.1), shall cease in-person operations and shall close to the public while this Order is in effect.

*Id.* On April 8, 2020, Governor Kemp, by Executive Order, extended the April 2 Order until April 30, 2020. (Ex. D. to Am. Compl. at 2, ECF No. 23-4).

Plaintiff submitted claims to Defendant seeking insurance coverage for business losses caused by COVID-19 under Section 20(h)(4) of the Policy. (Am. Compl. ¶ 7.) On September 15, 2021, and October 15, 2021, Defendant responded that no coverage existed under the Policy for Plaintiff's losses. (*Id.*) Defendant explained that the Policy does not provide coverage for COVID-19-related losses at Callaway Gardens. (*Id.*) Plaintiff thereafter filed suit in the Circuit Court of Richmond, alleging that Section 20(h)(4) of Defendant's Policy covers its COVID-19-related losses. (Compl. ¶ 6.) Plaintiff raises the same argument in its Amended Complaint. (Am. Compl. ¶ 19.) Plaintiff principally argues that coverage applies under Section 20(h)(4) because Governor Kemp's Orders (the "Orders") forced Plaintiff to close its business due to the

5

threat of hazardous conditions suspected at Callaway Gardens. (*Id.*) Plaintiff maintains that although COVID-19-related losses are expressly excluded from 20(h)(1)'s coverage extension to "infectious or contagious disease," such losses should nonetheless be covered under Section 20(h)(4) because the phrases "infectious or contagious disease" and "hazardous conditions" are not mutually exclusive. (Pl.'s Opp'n Br. at 7.)

Defendant moves to dismiss the Amended Complaint, arguing Section 20(h)(4) of the Policy does not cover Plaintiff's alleged losses because Section 20(h)(1)—the sole Policy provision which addresses business losses associated with "infectious or contagious disease"—explicitly excludes COVID-19-related losses. (Mot. at 7.) Defendant maintains that an alternative reading of the Policy would render Section 20(h)(1) meaningless and permit Plaintiff to access distinct coverage for "hazardous condition[s]" as a "back-door coverage grant for COVID-19 business interruption loss." (*Id.*) Defendant further contends that even if Section 20(h)(4) applies, coverage is not warranted because Plaintiff has not plausibly alleged facts to trigger coverage under that section. (*Id.* at 12–15.) Specifically, Defendant asserts the Amended Complaint fails to adequately plead Plaintiff closed the property in response to COVID-19, and that Governor Kemp issued the Orders in response to specific "hazardous conditions" at Callaway Gardens. (*Id.*) Indeed, Defendant contends the Amended Complaint only alleges facts showing the Orders were of general applicability, broadly issued to slow or halt person-to-person transmission of COVID-19. (*Id.* at 13–14.)

6

## II. STANDARD OF REVIEW

Defendant moves to dismiss under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). "A complaint need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (alteration in original) (quoting *Tobey*, 706 F.3d at 387). However, a "complaint must provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"Allegations have facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Tobey*, 706 F.3d at 386 (quoting *Iqbal*, 556 U.S. at 678). A court, however, "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930 F.3d at 644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)). In considering a motion to dismiss, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). Legal conclusions enjoy no such deference. *Iqbal*, 556 U.S. at 678.

In Virginia,[2] the elements of a breach of contract are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *See Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 134 (Va. 2009). To be actionable, Plaintiff must establish that the breach was material. *See Horton v. Horton*, 487 S.E.2d 200, 204 (1997). A material breach is a failure to do something so fundamental to the contract that failure to perform the obligation defeats an essential purpose of the contract. *See id.* Plaintiff also bears the burden of establishing the element of damages with reasonable certainty. *Nichols Constr. Corp. v. Virginia Machine Tool Co., LLC*, 661 S.E.2d 467, 472 (2008). Contingent, speculative, and uncertain damages are not recoverable because they cannot be established with reasonable certainty. *See Shepherd v. Davis*, 574 S.E.2d 514, 524 (2003). At issue, in this case, is whether Plaintiff sufficiently pled facts to establish with plausibility that Defendant breached its duty in the contract by refusing to cover Plaintiff's COVID-19-related losses.

Virginia contract law dictates that the interpretation of an insurance policy is a matter of law to be decided by the court. *See Nationwide Mut. Fire Ins. Co. v. Erie Ins. Exch.*, 798 S.E.2d 170, 173 (Va. 2017); *Dragas Mgmt. Corp. v. Hanover Ins. Co.*, 798 F.

---

[2] Virginia law applies in this case. In a diversity action, district courts apply federal procedural law and state substantive law. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) ("A federal court hearing a diversity claim must apply the choice-of-law rules of the state in which it sits.") The initial Complaint was filed in Virginia, so Virginia's choice-of-law rules apply. (*Id.*) Furthermore, the Policy includes a choice-of-law provision, stating that Virginia law shall apply. (Policy at 37.) Such provisions are presumed valid.

8

Supp. 2d 766, 772 (E.D. Va. 2011). "Courts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words" used in the policy. *Seals v. Erie Ins. Exch.*, 674 S.E.2d 860, 862 (Va. 2009). The canons of construction that generally govern contracts also apply to insurance policies specifically. *See Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 354 (Va. 2019). As such, "when the language in an insurance policy is clear and unambiguous, courts . . . give the language its plain and ordinary meaning and enforce the policy as written." *Selective Ways Ins. Co. v. Crawl Space Door Sys., Inc.*, 162 F. Supp. 3d 547, 551 (E.D. Va. 2016). In doing so, courts "must adhere to the terms of a contract of insurance as written, if they are plain and clear and not in violation of law or inconsistent with public policy." *Blue Cross & Blue Shield v. Keller*, 450 S.E.2d 136, 140 (Va. 1994). In interpreting an insurance policy, a court cannot "make a new contract for the parties different from that plainly intended and thus create a liability not assumed by the insurer." *Id.* (quoting *Pilot Life Ins. Co. v. Crosswhite*, 145 S.E.2d 143, 146 (Va. 1965).

However, "[insurance] companies bear the burden of making their contracts clear." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005). "Accordingly, if an ambiguity exists, it must be construed against the insurer." *Id.* (citations omitted). "In determining whether the provisions are ambiguous, we give the words employed their usual, ordinary, and popular meaning." *Nextel Wip Lease Corp. v. Saunders*, 666 S.E.2d 317, 321 (Va. 2008) (citation omitted). "An ambiguity, if one exists, must be found on the face of the policy," *Granite State Ins. Co. v. Bottoms*,

415 S.E.2d 131 (Va. 1992) (citation omitted), and "courts must not strain to find ambiguities." *Res. Bankshares Corp.*, 407 F.3d at 636 (citations omitted). "[C]ontractual provisions are not ambiguous merely because the parties disagree about their meaning." *Nextel Wip*, 666 S.E.2d at 321.

Moreover, courts applying Virginia contract interpretation law read such contracts "as a whole" to squarely identify the intent of the parties at the time of contracting and ensure "the various provisions are harmonized." *State Farm Fire & Cas. Co. v. Nationwide Mut. Ins. Co.*, 596 F. Supp. 2d 940, 946 (E.D. Va. 2009). "Provisions of an insurance policy must be considered and construed together, and any internal conflicts between provisions must be harmonized, if reasonably possible, to effectuate the parties' intent." *Virginia Farm Bureau Mut. Ins. Co. v. Williams*, 677 S.E.2d 299, 302 (Va. 2009); *see also Copp v. Nationwide Mut. Ins. Co.*, 692 S.E.2d 220, 223 (Va. 2010). In the event a term is undefined, Virginia law permits courts to "consider[] its meaning in the context of the polic[y] as a whole." *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 556 F.3d 150, 158 (4th Cir. 2009); *see also Midlothian Enters., Inc. v. Owners Ins. Co.*, 439 F. Supp. 3d. 737, 741 (E.D. Va. 2020) (observing that courts read "a word in the context of a sentence, a sentence in the context of a paragraph, and a paragraph in the context of the entire agreement.").

The "policyholder bears the burden of proving that the policyholder's conduct is covered by the policy." *Res. Bankshares Corp.*, 407 F.3d at 636. Yet "the insurer bears the burden of proving that an exclusion applies." *Bohreer v. Erie Ins. Grp.*, 475 F. Supp.

10

2d 578, 585 (E.D. Va. 2007). Therefore, "[w]here an insured has shown that his loss occurred while an insurance policy was in force, but the insurer relies upon exclusionary language in the policy as a defense, the burden is upon the insurer to prove that the exclusion applies to the facts of the case." *Bituminous Cas. Corp. v. Sheets*, 389 S.E.2d 696, 698 (Va. 1990); *see also Am. Reliance Ins. Co. v. Mitchell*, 385 S.E.2d 583, 585 (Va. 1989) ("Exclusionary language in an insurance policy will be construed most strongly against the insurer and the burden is upon the insurer to prove that an exclusion applies.").

All-risk insurance policies provide broad coverage against all risks other than those the parties know to be inevitable at the time of contracting. *See Fid. & Guar. Ins. Underwriters, Inc. v. Allied Realty Co.*, 384 S.E.2d 613 (1989). A fortuitous loss, in this context, "is essentially an event that is dependent on chance, an accident, or is unexpected." *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp. 3d 360, 371 (E.D. Va. 2020) (citing *Allied Realty Co.*, 384 S.E.2d at 613); *see also Ins. Co. of N. Am. v. U.S. Gypsum Co.*, 678 F. Supp. 138, 141 (W.D. Va. 1988), *aff'd* 870 F.2d 148 (4th Cir. 1989) ("'All risk' insurance contracts are a type of insurance where the insurer agrees to cover all risks of loss except for certain excluded events.") The insured has the initial burden of proof to establish that the loss was fortuitous.

### III. ANALYSIS

On March 8, 2020, Plaintiff purchased from Defendant an "all-risk" insurance policy that covers loss or damage to Callaway Gardens resulting from all risks other than

11

those expressly excluded. (Policy at 33.) Section 20 of the Policy includes "Extensions of Business Interruption Coverage," encompassing coverage for "Loss of Attraction." (*Id.* at 31.) The "Loss of Attraction" section covers losses "when there is an interruption or interference with the business of the [i]nsured as a consequence of . . . (1) Infectious or contagious disease (excluding Coronavirus 2019 COVID-19)," "(2) Murder or suicide," "(3) Injury or illness sustained by any person arising from or traceable to foreign or injurious matter in food and drink," and "(4) Closing of the whole or part of the Covered Property of the Insured by order of a public authority consequent upon the existence or threat of hazardous conditions either actual or suspected at the Covered Property." (*Id.*)

Based on a plain reading of the all-risk Policy, the Court has determined that the Policy covers all accidental or fortuitous losses unless the cause of the loss is explicitly excluded under the contract. *See Allied Realty Co.*, 384 S.E.2d at 613. On March 8, 2020, Plaintiff entered into a contract with Defendant with the intent to have the Policy cover all foreseeable and unforeseeable risks except for those which were explicitly excluded. Later in March and April of 2020, Governor Kemp issued various Executive Orders to mitigate the spread of COVID-19. These Orders allegedly forced Plaintiff to close certain portions of Callaway Gardens. Plaintiff later submitted a good faith claim for COVID-19-related losses under Section 20(h)(4) of the Policy. The question is whether the mandated closures based on the Orders qualify as a "fortuitous loss" to Plaintiff's property. In other words, if the Court concludes that a plain reading of the Policy explicitly excludes Plaintiff's claim, then the Court must grant Defendant's

Motion to Dismiss. However, if the Court concludes that a plain reading of the Policy does not explicitly exclude Plaintiff's claim, then the Court must deny Defendant's Motion.

The Court concludes that, based on a plain reading of the Policy, Section 20(h)(1) explicitly excludes losses caused by COVID-19, such as the alleged losses claimed by Plaintiff. Although Plaintiff asserts coverage is warranted under Section 20(h)(4), the Court must construe the Policy as a whole, harmonizing all of its provisions and recognizing their context as well as the intentions of the parties. *See Williams*, 677 S.E.2d at 299; *State Farm Fire & Cas. Co.*, 596 F. Supp. 2d at 946. Upon reviewing the ordinary meaning of the Policy, the Court finds that Section 20(h)(1)'s COVID-19 exclusion unambiguously addresses and excludes losses resulting from COVID-19, such as the alleged losses at issue in the instant case. *See Res. Bankshares Corp.*, 407 F.3d at 635; *Saunders*, 666 S.E.2d at 321. As such, the Policy does not cover Plaintiff's alleged COVID-19-related losses. If the Court were to decide the Policy covers such losses, such a conclusion would contradict well-established Virginia law and render the COVID-19 exclusion in Section 20(h)(1) meaningless.

Plaintiff contends that Section 20(h)(4) covers its COVID-19-related losses because "infectious and contagious disease" and "hazardous conditions" are not mutually exclusive. Plaintiff maintains that Section 20(h)(1)'s COVID-19 exclusion for "infectious and contagious disease" does not preclude coverage for COVID-19-related losses under Section 20(h)(4) because "hazardous conditions" also encompass COVID-

13

19-related losses. This argument fails.

The decisions in *Central Laundry* and *Rollins* are instructive to the Court's analysis and are guided by the fundamental principles that insurance policies must be interpreted by their plain terms and in a way that imparts meaning to each of the policy's terms. *Central Laundry, LLC v. Illinois Union Ins. Co.*, 578 F. Supp. 3d 781 (E.D. Va. 2022); *State Farm and Cas. Co. v. Rollins*, 187 F. Supp. 3d (E.D. Va. 2016). The insured in *Central Laundry* sought coverage under a pollution policy for its business losses associated with COVID-19 closure Orders issued in the Commonwealth of Virginia. 578 F. Supp. 3d at 785. The insured argued the alleged presence of COVID-19 was a "pollution condition," a term defined in the policy to include "irritants" and "contaminants." *Id.* at 786. The court rejected the insured's argument on numerous grounds, observing that the policy had a separate insuring agreement for "indoor environmental conditions." *Id.* at 791–93. The court found the policy's separate treatment for "pollution conditions" and "indoor environmental conditions" effectively signposted that "pollution condition" was meant to solely encapsulate traditional environmental pollutants rather than non-traditional indoor pollutants. *Id.* at 191. As in *Central Laundry*, the Policy here effectively signposts that "hazardous conditions" must be read to carry a distinct meaning from "infectious or contagious disease." In applying the same rationale to this case, because Section 20(h)(1) provides coverage for "infectious and contagious disease" and clearly contemplates and excludes COVID-19-related losses, the Policy does not cover Plaintiff's COVID-19-related losses.

14

Similarly, the court in *Rollins* interpreted a homeowner's insurance policy that excluded "childcare services" and "business pursuits" but offered a narrow exception to these exclusions for "occasional" childcare services or "babysitting." 187 F. Supp. 3d at 641. If the claimant's underlying injury arose from "babysitting," then coverage would lie. *Id.* at 646. However, if the injuries arose from "childcare services," coverage would be barred. *Id.* The court, applying Virginia law, acknowledged that while the terms were closely related, they nevertheless had separate and distinct meanings. *Id.* The court ultimately concluded the services provided by the insured clearly fell within the definition of "childcare services," so coverage did not apply. *Id.* at 646. The court rejected the insured's attempt to weave ambiguity into the undefined terms, observing that terms in an insurance policy, even when undefined, must be read together with the whole of the policy and in such a way as to effectuate the entirety of the agreement. *Id.* at 645 (citing *City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc.*, 628 S.E.2d 539. 541 (2006)).

So here, too, the terms "infectious and contagious disease" and "hazardous conditions" are closely related and undefined by the Policy. However, the terms must be read together with the whole of the Policy and in such a way that gives effect to the entirety of the agreement. *See id.* Therefore, in concert with this view, the Court believes Plaintiff's alleged COVID-19-related losses clearly fall within the Policy's definition of "infectious and contagious disease." A plain reading of the Policy provides that the parties intended to exclude coverage for COVID-19-related losses like the losses

15

Plaintiff allegedly suffered in the immediate case. Furthermore, Plaintiff's attempt to sow ambiguity into the phrase "hazardous conditions," notwithstanding the clear unavailability of COVID-19-related coverage under Section 20(h)(1), would render the COVID-19 exclusion in Section 20(h)(1) meaningless. Thus, the Court finds that Defendant met its burden of making its contract clear and the COVID-19 exclusion applies to the facts of this case. Thus, Plaintiff's claim is explicitly excluded.

Additionally, Plaintiff primarily relies on out-of-context excerpts from cases and fails to recognize such cases' core holdings. The Court will only address a few relevant cases cited by Plaintiff.

First, in *PBM Nutritionals*, the Virginia Supreme Court, applying Virginia law, affirmed the circuit court's holding that an infant formula manufacturer was not entitled to coverage for its loss of millions of dollars' worth of contaminated formula due to that policy's pollution exclusions. *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 724 S.E.2d 707, 715 (Va. 2012). The insurance policy in that case barred coverage for "loss or damage solely and directly caused by or resulting from the presence, release, discharge or dispersal of 'pollutants' *unless* the presence, release or discharge or dispersal is itself caused by a peril insured against." *Id.* at 629–630 (emphasis added). In the case at hand, Plaintiff attempts to support its position by extracting one out-of-context line from *PBM Nutritionals*: "[a]n exception to an exclusion only has bearing on that exclusion's applicability." (Pl.'s Opp'n Br. at 8 (citing *PBM Nutritionals*, 724 S.E.2d at 711).) Plaintiff claims this statement, here, means the Policy's COVID-19 exclusion only

16

applies to Section 20(h)(1) and that COVID-19-related losses are nonetheless covered under Section 20(h)(4). (*Id.*) This reading misconstrues the law. Unlike in the immediate case, the court in *PBM Nutritionals* addressed the policy's exception to an *exclusion* of coverage and ultimately held it did not create coverage where none exists. *PBM Nutritionals*, 724 S.E.2d at 715. Here, however, the Policy is significantly different in that it contains an exception to a limited *grant* of coverage and not an exception to an *exclusion* of coverage. Thus, *PBM Nutritionals* has no bearing on this case.

Second, Plaintiff's reliance on *Elegant Massage* is also misplaced. 506 F. Supp. 3d at 360. There, the court held that a policy that excluded coverage for "fungi, virus or bacteria," did not bar coverage for "direct physical loss[es]" resulting from COVID-19. *Id.* at 377–79. The Policy in the instant case differs from the policy in *Elegant Massage* because, the exclusion explicitly and unambiguously states "COVID-19"—not merely "virus"—and the exclusion is located in a specific grant of coverage for "infectious or contagious disease."

Furthermore, Plaintiff claims Section 20(h)(4) covers its losses because the Georgia Orders generally applied to Callaway Gardens even though the Orders broadly applied to all Georgia businesses. (Pl.'s Opp'n Br. at 13–16.) Coverage under Section 20(h)(4) is conditioned upon "[c]losing of the whole or part of the Covered Property of the Insured by order of public authority consequent upon the existence or threat of hazardous conditions either actual or suspected *at the Covered Property of the Insured.*" (Policy at 22 (emphasis added).) The Court is persuaded by Defendant's argument that

17

even if Section 20(h)(4) were to apply, Plaintiff would still be unable to recover because Plaintiff has not and cannot establish that Governor Kemp issued the Georgia Orders in response to specific hazardous conditions *at* Callaway Gardens, as is required under the insuring agreement.

As Defendant points out, courts nationwide have examined whether shutdown orders of general application can trigger similar loss of attraction and business interruption insuring agreements and held such agreements only apply where orders specifically address conditions unique to the insured's property. *See 1210 McGavock St. Hosp. Ptnrs. LLC v. Admiral Indemnity Co.*, 509 F. Supp. 3d 1032, 1041 (M.D. Tenn. 2020) (finding no COVID-19-related insurance coverage exists under similar public authority orders because the orders applied generally to control the spread of COVID-19 by limiting close human interaction, and did not apply to unique, hazardous conditions at the specific property); *Creative Bus., Inc. v. Covington Specialty Ins. Co.*, 559 F. Supp. 3d 660, 674 (W.D. Ill. 2021) (same); *L&J Mattson's Co. v. Cincinnati Ins. Co., Inc.*, 536 F. Supp. 3d 307, 317 (N.D. Ill. 2021) (same); *Firenze Ventures LLC v. Twin City Fire Ins. Co.*, 2021 WL 5865710 *6 (N.D. Ill. Dec. 10, 2021) (same); *Café Plaza de Mesilla Inc. v. Cont'l Cas. Co.*, 519 F. Supp. 3d 1006, 1015 (D.N.M 2021) (same); *Totally Tickets v. Sentinel Ins. Co., Ltd.*, 549 F. Supp. 3d 1309, 1316 (W.D. Okla. 2021) (same); *Mayssami Diamond, Inc. v. Travelers Cas. Ins. Co. of Am.*, 2021 WL 1226447 *4 (S.D. Cal. Mar. 30, 2021) (same).

This Court adopts the reasoning of the panoply of other courts and finds that

18

Governor Kemp issued the Orders broadly to limit human interaction and control the spread of COVID-19 and not to address specific hazardous conditions at Callaway Gardens, as is required by the Policy. Thus, because the Georgia Orders were orders of general applicability, Plaintiff does not and cannot adequately allege its COVID-19-related losses are covered under Section 20(h)(4).

### III. CONCLUSION

The Amended Complaint fails to adequately plead Defendant has a legally enforceable obligation under the Policy to insure Plaintiff's COVID-19-related losses. *See Wright*, 671 S.E.2d at 134. Section 20(h)(1) explicitly contains an exclusion for such COVID-19-related losses. Granting coverage under Section 20(h)(1) of the Policy would render Section 20(h)(4) meaningless, contravening a bedrock of Virginia law governing contract interpretation. Furthermore, Plaintiff has not plausibly alleged facts to trigger coverage under Section 20(h)(4), even if it applied. Though the Court sympathizes with Plaintiff and other resort owners around the nation who have suffered greatly from reduced demand due to the pandemic, Plaintiff fails to adequately plead Defendant's Policy covers its alleged COVID-19-related losses. Finding that no coverage exists under the Policy for Plaintiff's alleged losses, the Court will grant Defendant's Motion to Dismiss. The Court further finds that any amendment would be futile based on the facts and circumstances of this case and will dismiss Plaintiff's Amended Complaint with prejudice. *See Elrod v. Busch Ent. Corp.*, 479 F. App'x 550, 551 (4th Cir. 2012) (allowing trial courts to deny leave to amend a complaint if the complaint, as amended,

would not withstand a motion to dismiss); *see also Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011).

    An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: Feb. 23, 2023
Richmond, Virginia